Petitioner v. FAA, Ms. Lippman for Petitioner, City of Culver City, California, Ms. Taylor for Petitioner, SMCCA, and Mr. McBadden for the respondents. Good morning, your honors. If it pleases the court, the best way to introduce this case is to tell you that it's City of Phoenix v. Huerta on steroids. This case involves 18,000 square miles, 21 airports, and countless millions of people. In Phoenix v. Huerta, this court found that common sense didn't allow a finding of no significant environmental impact when it involved one airport and a 693% increase in, I'm sorry, and a 300% increase in noise complaints. Here, it's 693%. Huge project. Why is this important? Actually, I'm not sure about that statistic. I wanted to ask you about that. We're told that there's this sevenfold increase in complaints received by the city. City of Los Angeles, right? Yes. But isn't it also the case that in the order, the FAA said, by the way, if you have any complaints, don't send them to us, send them to the city. And that's why it's... So there may have been no increase in complaints. They're just going to the city now. We just don't know. But the city, in its amicus brief, reported that during the period of November 2016 to November 2017, it had received 2,936, approximately, complaints about noise. And during that second, before that period, it had received 2,936. During that one-year period, 29,000. And how many went to the FAA before the order issued? We don't know. Oh, you do know. That's right, because the FAA referred all complaints to the city of Los Angeles. I'm saying before it did that, do we know how many complaints it was receiving? We don't, because the FAA didn't report it. But we do know... So they might have been receiving just as many and said, we don't... You're sending them to the wrong place, send them to the city. Might have, but that would be speculation. The evidence says that... No, no, it's speculation that there's been an increase. We don't know what the baseline is. We know only the baseline at the city of Los Angeles, which was the receptor of complaints. After the point, pardon me, just at the point when they were referred. After implementation, it was the receptor of complaints, for reasons that are as yet unexplained. In any event, why that is important is because this project was treated by the FAA as if it were a one airport project. Why do we say that? Because, for instance, the FAA used... I'm just curious, is this your... Are you starting with this argument because you've made a lot of arguments in your brief. Is this your strongest argument? The fact that it was a major project that was treated as a one airport project? Yeah. Is that the strongest? In other words, if you want us to look at your most powerful argument, is it this one? The failure of the FAA to use the proper model for a project of this scope by its own regulations, that is the strongest argument. It is entitled to no deference because it has eschewed its own regulation. Is this the NERS versus AEDT? Correct, Your Honor. That's correct. And where an agency... I'm sorry, I didn't understand. This is which argument? Which one? This is the noise argument. The noise argument. That's correct. Using one model instead of the other. Well, it's not quite that simple, Your Honor. I assumed it was. I was hoping you would agree with me that that was the issue, but I guess not. Go ahead. Is it NERS versus AEDT or is it DNL versus CNAL? No, no, no, no. It's NERS versus AEDT. Okay, got it. We're not discussing CNAL today. Okay, I want to hear your argument about that. I really do. But what do you do with the agency's argument that, hey, they did both tests and the results were basically the same? Because when they did it, it was 2017, and if you will note, there is no reference to the record where the public or decision makers for the public could make any assessment of the integrity of that 2017 study. Okay. Well, have you pointed out in your brief any defects in it? I take your point about that, but do you see any problems with what they did? With what? I'm sorry, Your Honor. With the use of... You said, well, the public hadn't had an opportunity to comment on the agency's conclusion that the use of the second... The AEDT. Yeah, that they both showed essentially the same results, no significant impact. And I take your point that the public didn't have an opportunity to comment. I was just asking you whether you see any defects in... Whether you've identified any defects in what the agency did. The agency didn't provide that. We don't know if there are defects or no defects. That's the problem. The whole thing is extra record. That particular study is, yes. And so we had no opportunity to analyze it and find if there were any defects or if their conclusions were in fact correct. And in any event, even if we had been given that study in 2017, it would have been too late because the project was already implemented by that time. Okay. So their answer, as I recall, is the timing was such that NERS was appropriate. The March 12th cutoff date for switching to AEDT exempted studies already underway, loosely speaking, and this was already underway. That's what they say. Let me explain why that is not correct. You made a distinction between screening and analysis, okay? Which is a little difficult. But then they come back and say, well look, twice the contractor, ATAC, submitted to the agency a request to make variations in the NERS. For instance, certain aircraft couldn't be modeled within the confines of NERS, so they're going to use substitutes. And the FAA said, okay, go forward with NERS using those substitutes. Well, that's right. That's the fox guarding the hen house, isn't it? Because here's why that doesn't work. Number one, they made ATAC was their own concern. Well, no. It's the fox invoking the exemption for approvals that are given. Well, that's a little different. Those are two separate arguments. Okay, go ahead. The exemptions, which were supposedly done in advance, were in fact done in 2015 and 2016, which was far along in the process by the time that they had already used NERS for three years when they should have been using AEDT. So those exemptions were not prior exemptions. They were post-exemptions. Well, they're not prior to when the FAA claims was when they initiated, right? They're sort of ratifications in the midstream of this thing. Well, if they say they got them... As a practical matter, the FAA didn't say, wait a minute, you should have been to the office. You should have been using AEDT. They should have said that because they didn't get... The FAA attests that it got the approvals in advance. In advance were the words. They didn't. They got it in advance of making these But the analysis was way far along, and here's why I would point out to you that that analysis was inappropriate for a project of this scope. The model itself was inappropriate, but here's the reason. All of us lawyers who have been to law school learned in the first year what the essence of legal analysis is. It's IRAC, issue, rule, analysis, conclusion. In order for there to be a real analysis, there has to be a rule, and there has to be evidence to apply to the rule. Here, in technical analysis, there has to be a model, i.e. the rule, and data, i.e. the evidence. According to the FAA, that data was not collected and input into the model until December 2012. It may be input, but they started collecting it a good deal earlier, it seems to me. Well, they may have started collecting it, but they didn't calibrate the model until December 2012, seven months after they had approved the use of AEDT for projects of this scope. In other words, they were... Do you know the answer to this? If you're using... Depending upon which of those two models you're using, would you collect somewhat different data? Pardon me, I'm sorry. Would you collect somewhat different data, depending upon which model you're going to use? Presumably not, but, frankly, I'm not the technician on this case, so I can't answer that question with specificity. I can only say that when you start calibrating a model is when analysis begins under our own model of analysis of legal issues. It's the same thing. I don't hear any more questions. Thank you. We'll hear from your colleague. Good morning, Your Honors. May it please the Court, I'm going to address the non-EPA issues. The non-what? Non-EPA issues. Before you do that, I want to ask you a question about a section in your brief that I thought was intriguing. It starts on page 45, and it's entitled, Deference to FAA Technical Determinations Contravenes Most Basic Policies and Separation of Powers. Do you know what section I'm talking about? That was a section that was drafted by Ms. Lichman. Oh. So do you not want me to ask you a question about it? I don't know. Well, I'll ask you the question, and then if you can't answer it, we can ask her. I mean, you cite a dissent by then-Judge Gorsuch about Chevron deference in that section, but is this case about Chevron deference? Isn't this all about interpreting agency regulations and review of agency fact-finding? I'm sorry, Your Honor. I can't answer that question. You don't know? Okay. Let's get another reply. Yeah. Okay. We'll go ahead then. Okay. The issue that I would like to address is the fact that apart from NEPA, federal law requires that the FAA protect people on the ground from the effects of the noise and emissions pollutions of affected residents. The FAA has failed to do this in this case. What they have done is they have stated that they have completed their NEPA obligations and created no significant increase in noise, but they haven't looked at the possibility that they could design approach and departure flight routes that would reduce noise and emissions pollution. And what's your best authority for the proposition that when the FAA undertakes a project designed to improve aircraft efficiency, which is what this was, right? The best argument... That's what this was. What's the best authority for the proposition that in doing that, it has to, in addition to making sure it doesn't increase noise, it has to find ways to reduce noise? The best proposition... What's the best authority? ...lies with the statute, the Division 100 statute, which mandates, where Congress mandated that the FAA consider to the greatest extent practicable to design approach and departure routes that reduce noise, specifically mentions that their reduction of noise is a mandatory consideration... No, no, that consideration, not reduction. Consideration to the greatest extent practicable. Obviously, the Supreme Court in Lockheed Terminal case, City of Burbank versus Lockheed Terminal, said that the FAA has to balance safety and efficiency with the protection of people on the ground from aviation noise. So the consideration is obviously meant to be a balance with safety and efficiency. Certainly, there will be cases where the safety and efficiency outweigh the reduction of noise or the protection of people on the ground. But in this case, they didn't even consider any possible departure or approach routes that would reduce noise. And they specifically say this in their comment, in their response to the comment. They did, did they not try to reduce the increase? They said that there would be no significant increase. Right, but then they moved one of the locations, you know, that, what was it, Whiffy, something or other, in Culver City, right? They moved that a half mile or something specifically in order to reduce the increase. Correct. I believe that that was what they said in the reply brief, was that there would still be no significant increase in noise. But there was no discussion in the environmental assessment or anywhere else that they looked at the reduction of noise as a possibility, that they balanced... Reduction below the no action alternative. That's what you want, right? Below the no action alternative. Well, yes. The status quo. The status quo, that there was no attempt to reduce noise. They stated that they looked at noise, that they considered noise, but they didn't look at the reduction of noise. And that's an important distinction because what Congress mandated was that they look at the reduction of noise rather than just the significant increase. These issues were raised in comments to the FAA and their response was that there would be no significant increase in noise. This goes back to, as I said, the Lockheed Terminal case where there must be a balance between the safety and efficiency of the routes and the protection of people on the ground. And in this case, there has been no balancing between the protection of people on the ground and the safety and efficiency. While the Southern California Metroplex Project may comply with NEPA, federal law goes beyond NEPA and requires that the FAA to, at the very least, consider designing flight routes that reduce aviation noise and emissions in order to protect the people on the ground. Because the FAA has failed in this instance to meet that low standard, its action is arbitrary and capricious. The FAA's decision should be set aside and further implementation of the Metroplex Project should be enjoined until it complies with federal law. Is it your position that even if the FAA found there would be literally no increase in noise or emissions, that they would still have failed in their obligation to consider looking for reductions? Put that way, yes, it would be. The important thing here is that they consider the reduction of noise, that they use some kind of metric which they had available to them to show that they considered it, they looked at it, it wasn't practical, they did the balancing test, and it wasn't practical. Was it you or your colleague who should address the CNEL argument? Excuse me? The argument about the DNL versus the CNEL. Yes, that's an argument that Ms. Litchfield... So, I just want to pursue this for just a second. I want to ask you about the statute. So, the NextGen program has these seven goals, right, that Congress adopted for the... Correct. And one of them, as you point out, is to the extent practical, reduce exposure of noise. That's one of the seven goals, right? That's correct. Okay. Is there anything in the statute that says that the FAA has to consider all seven of them in every project? Well, the beginning of the section says these are the goals of NextGen, and it says the FAA shall, and then there's a list of, I believe, seven goals. Well, I mean, it did this to improve efficiency. It undertook this to improve efficiency and quality of service and to take advantage of more sophisticated GPS data. Those were its two goals, right? Your position is it has to consider all seven every time it... Yes, to the extent practical that all seven, not all seven in each project will be applicable to the development of flight routes. And the seventh goal, the consideration of noise and protection of people on the ground, is specifically conditioned on the development of flight routes and flight paths, approaches and departures. It states that if the FAA is doing that, then it must consider, to the greatest extent practical, the reduction of noise and emissions. Okay. Thank you, Your Honor. Yeah, thank you. We'll hear from the government. Good morning, Your Honors, and may it please the Court. My name is Lane McFadden. I represent the Federal Aviation Administration and the Federal Respondents. I'd like to begin with Vision 100 and Congress's requirement that the agency consider, to the extent practicable, the effects of noise impacts on people when designing new flight routes. This project always did have that in mind. The study team report explains that at the very beginning, that was considered a major constraint on the design of the project. I can see that at JA 98 and 99. The FAA could have radically reimagined the airspace of Southern California, designing only the most direct routes possible without consideration of existing land uses. That's not at all what this project was. This project kept flights in historic flight corridors and rewrote the procedures to take advantage of automated flight systems, GPS technology, and all of the modern advancements in the way that procedures can be designed and flown. I'm looking at 98 and 99. Can you point to your citation there? Yes, Your Honor. At 98, this is the study team's report about how they developed the original iterations of this project. In the middle of the page, Section 3.3, Assumptions and Constraints, explains that it was always important when designing possible procedures to look at for introduction into a project, to avoid any that would have significant environmental impacts, which were noise and air pollution. And then on the next page, they explain that the way... Wait a minute. You're missing the argument here, which is not that you didn't try to avoid greater increases, but rather that you didn't look for reductions. Right. Well, so then we'll turn to the text of the statute itself, which does not require that. You'll see that the requirement to consider safety, security, efficiency are written in more hortatory language. The agency, I forget if it shall or must consider those. But then Goal 7, the reduction in noise, is something that must be considered to the extent practicable. It simply is not at all... To the greatest extent practicable. Yes. Right. But we say it's not a goal. It's just a consideration, isn't it? Well, I think those are somewhat synonymous. I mean, it is a goal to consider it, and so I think we've demonstrated that. It is not a plausible reading of the statute. The agency must reduce the noise. So if you had two alternative ways to increase operational efficiency, one of which would actually reduce emissions, noise, or pollutants, and the other of which would not, would you not be obliged to take the one that reduces emissions? Again, assuming operational efficiency is unchanged? If they were otherwise identical, I think you would, yes. Because it would be practicable to do so. Okay, so now when they're not exactly the same, what we have is you have alternatives and you look for the one that increased emissions the least, but you didn't ask whether there were things you could do to reduce emissions, correct? Below the status quo. Right. I still think that's consistent with the statute. I mean, there is a difference between asking whether we can do things that reduce noise and environmental impacts and then proposing procedures that would do so, because there weren't any procedures that could be proposed that fit within the constraints of this airspace and all of the safety and separation rules, all the many rules that apply. Is that to be found in the reported decision? There are, and we cite in our, it's not stated that explicitly in the reported decision. We cite in our brief the records of the study team as they were considering various proposals where the agency had rejected certain proposals because they wouldn't meet the safety and efficiency requirements. And the white paper that accompanies the final environmental assessment addresses specific comments that ask for specific changes to affect the community noise, and some of those could be adopted and some of them couldn't. And so there's a discussion in that paper about why it is that some moves that would have reduced noise or would have shifted, more likely, the noise to another community was unsafe for one reason or another. It would mix with traffic from another airport. It would be in a different classification of airspace. There were various reasons why it couldn't be done. But had it been done, it would have actually reduced. I think there were some proposals that were thought to have actually reduced noise, yes. Okay. And where do I find that? I'm afraid I don't have the record citation for me. It's mentioned in our brief as the white paper that accompanies the final environmental assessment. It's discussed in the section where we talked about the movement of the Cliffey Waypoint, which affected Culver City and did satisfy the purpose and need of the project and also further reduce the increase in noise. But the airspace is simply too congested and too complex to allow the number of operations that come in and out of there, it's millions a year, to continue and also to do so in a way that completely reduces noise impacts in total. Completely reduces? No, that's not the... Well, I mean, I understand their argument. Any reduction was the goal. I mean, there are areas where there were reductions and there are areas where there were increases. And I understand their argument to be that the agency has to totally, has to result in a net decrease in noise overall. Well, consider whether it can. Consider whether it can. That's the argument. So I think the record amply demonstrates that it was the practicability of that was considered and the agency did what it could to accommodate those concerns. And that's all that's statutorily required. Could you give us that record citation before you leave? Yes, Your Honor. Thank you. Turning, I suppose, to the... And your friends on the other side as well. I'm sorry? And notify your friends on the other side as well. Yes, of course. Okay. Turning to the use of the noise integrated routing system, as Your Honor correctly pointed out, that was something provided for in the guidance memo starting in March 2012, except for in two situations. One is where you've already begun your noise analysis, which this project had, and the other is where you receive advanced written approval from the Office of Environment and Energy, which eventually the FAA did get before its decision was made, which is what the timing that's necessary to comply with that. But overarching all of this is that, repeatedly, today it was described as a regulatory requirement, which is inaccurate. This is an internal FAA guidance memo asking its own internal components to use the AEDT going forward from a certain date for certain projects. But there wasn't any legal violation at issue here, and as Your Honor has pointed out, nor was there any prejudicial harm accompanying it. Of the 342,000 individual grid points where noise was individually measured, three of them turned out to be different when this project was evaluated under AEDT as opposed to when it was evaluated under NEARS. The evaluation under AEDT is not on the record. It's not, Your Honor. It's post-decisional. So I don't know how we are supposed to consider that. Well, it only matters as to remedy, Your Honor. It doesn't affect whether the agency's NEPA compliance was valid. That stands on its own, and that's because the use of NEARS was appropriate at the time. Yeah. That would moot the question about the AEDT, if using theirs was appropriate. Right. Now, your claim was that you got advance approval, but advance of what? Advance of the decision being made, of the record of decision, which relies on the information from the model. Is that what the regulation says? Is that what the regulation says, an advance of the decision being made? It doesn't specify. I thought it said an advance of the analysis being done. Is that not correct? Let's take a look at that. It simply says, except where advance written approval has been granted, do you use an equivalent methodology and computer model, and it doesn't specify the time. So using the methodology, that's what has to be in advance of using the methodology. That is one reading, yes. And so I think maybe. And what you got was an advance of substituting A320s for A380s. Right. And so I think those are best understood as a ratification of the agency's decision to continue using the model it had already been using. Because it had been using NEARS in 2011 to screen these proposed procedures to see if they would comply with the constraints of the project, one of which was to always avoid the possibility of significant environmental impacts. And that's a clearly defined threshold established by federal regulation that's, I think, well understood here. And so the ones that advanced to the proposed alternative stage were those that wouldn't approach that threshold and didn't cause those noise concerns. So there had to be noise analysis done to know that. They point out in their reply brief that a noise screen is overly simplistic, but the record explains, you see this at J66, that it's simplistic in the sense that it always tries to capture the worst-case scenario. A noise screen is a rough way to measure noise that assumes the worst, so you're never going to accidentally miss a potentially significant impact. And then if you get to that point, then you can do a more detailed analysis and learn more about it. But the noise screen is a form of noise analysis. It uses a computer model to tell you what the noise is going to be. That's what the point of all of these efforts are. And those indicated the proposed alternative would not cause a significant noise increase, which was borne out to be true. Turning briefly to Your Honor's questions about deference, this isn't a case about statutory or regulatory interpretation. I think Marks v. Oregon Natural Resources Council. Well, wait, we did just finish a discussion about how to interpret the next-gen statute, right? Didn't we? I suppose that's right, yes. I mean, it hadn't been argued to that specifically, but that is a statute that is directed at the FAA. And so if you think this term is ambiguous, I suppose Chevron deference might apply in that circumstance. I don't see any ambiguity in Congress's direction to take account of noise to the extent practicable. That doesn't require an overall reduction in noise, as has been suggested. It requires consideration. Mitigated, I suppose, by practicability. We haven't argued that there's any ambiguity that requires agency difference in that context. I misunderstood your point. Is it your argument, then, that the agency did take it into account to the extent practical? Yes. Okay. And you're going to give us that cite, right? Well, yes, Your Honor. I mean, I think in addition, I mean, I think the page of the study team report I cited, JA 9899, I think does indicate that, that one of the guiding principles at the very beginning of the process was avoiding significant noise impacts, which means that you're thinking about Well, no, that's avoiding increasing noise. Their argument is that you have an affirmative duty to reduce noise. That's their argument. I see. proposition that the agency looked for procedures specifically that would reduce status quo noise. I thought your argument was under the statute the agency isn't obligated to consider all seven of these. Is that? The obligation is different. I mean, the obligation to consider noise, to the extent practical, is different than the obligation to improve safety, which is mandatory. They are phrased in different ways. And so it's true both that not all seven goals will be applicable, but of course goal seven noise is somewhat applicable here because there's always the potential for noise changes if you change inter-traffic procedure. We're not arguing it's inapplicable. We're arguing that the imposition on the agency is less because the way that the requirement is phrased requires consideration and doesn't mandate a reduction in the way that petitioners have suggested. Right. I was simply asking, therefore, you have to point to something in the record where the agency considered it and decided it wasn't applicable. I thought that's what you were doing when you said you didn't have it immediately at hand but referred to the document. I think it begins at 335. Yeah. Is that what the document is? The document at 335? Yeah. I thought that's what you were referring to. Maybe not. Yes. That is evidence of that consideration. That's in response to comments. That's the document, I believe, that it is, the white paper accompanying the final EA. Oh, is this the one in which the Culver City point was moved, the WIFI? Yes. It's one of the end. But they're not the only one described in that document. There are other proposals considered in that document as well. And some were accepted and some could not be accepted. And all of them were proposals designed to reduce noise impacts on a specific community. And some of them were inconsistent with design criteria and safety goals. And some of them were implemented as an example of the agency taking the public comment process quite seriously and adjusting its procedures in response to those comments and concerns. So I do think that that document, I appreciate you pointing that page number out, starting at J8335 is the best evidence of that consideration. All right. So no need to be identifying that before you leave if you've done so. No. I'll just say it. So let me just ask you about the argument that has not been made today, but it's in the briefs, about the failure to use the CNEL noise metric. That, I didn't understand why, I think your argument was the standards that you're supposed to meet and that determine whether you have a significant impact and so on are all expressed in terms of the other metric. That's right, yeah. What is it called, the DBL? DNL. DNL. And that you couldn't use the CNEL, therefore, to determine that. That struck me as something like saying, well, the standards are all in English units, so we couldn't use meters. We had to use yards. But, of course, you could use meters and then translate them into yards. Well, sure, I think it could have been possible to express things in terms of both metrics, but since you would ultimately have to do the conversion back to DNL in any event, it didn't seem necessary to use the intermediate step of a different metric. Well, you'd get a different number because using CNEL, you'd add five or ten points. Right, so you'd have a different value. So when you converted it back to DNL, you would have a higher result that might not have resulted in a minimal or non-significant impact. Well, right, and maybe that's the flaw in the analogy between English units and metric units because it wouldn't, of course, be a direct conversion. I mean, DNL weights noise differently. So the raw numbers are the same, and then you add particular additions depending on the metric you're using. So a conversion from CNL to DNL wouldn't give you the DNL of anticipated noise impacts. It would give you some other value that doesn't match up with 14 CFR Part 150. So we wouldn't convert them directly. You'd have to produce two different values and say, here is the DNL value, here is the CNEL value, and then everyone would just be confused as to which one they should look at and what they should know about the fact that they are different. Can we use yards and meters for a moment? Sorry? Can we use yards and meters for a moment? Sure. It's a little easier. All right, so the standards are expressed in yards. And if you use meters, you're going to add basically 10%. And when you do that, and you translate it back into yards, 100 yards becomes 110 yards. Right. But you're still measuring raw linear value. The object is as long as it is. And you can express that in different numbers. No, no, no, because there's a fictitious length added to it when you use CNEL, right? There's an arbitrary 5 or 10-point addition in that model. Right, exactly. But it's added to a 24-hour average. It's not added to the, like, absolute value of noise. And so because you're adding it to the- Why are those different? Why are those different? So the way that both of these metrics work is that they take the total number of single noise events over a 24-hour period, and then, you know, you add to whichever ones of those events occurred during certain hours of the evening, and then you average the total. And also these values are, because they're decibels, they're logarithmic, which adds some complication in the math. And so simply saying, well, you know, CNEL is higher than the DNL number, that means that the noise is louder. It's not quite that clear. It's not that it's louder. It's that it's more important because it's while people are sleeping. Right. Right. And that's why California uses it for their own projects. It gives a greater weight to people's evening time sensitivity to noise. I mean, there's no dispute that it does that. The question is whether- You've got a regulation that says when you're in California, you use California standards. It doesn't say that, Your Honor. It says when California is doing a state project that requires federal approval, FAA will allow the use of CNEL. But there is no federal requirement that FAA ever use CNEL. Well, I don't know. Let's look at that. What is that, 1050 or 5050? Yes, that's an FAA order rather than-I misspoke to say that it was a regulation. Where does it appear? Let's see if we put that in the joint appendix. So I don't believe that the document is in the joint appendix, but the relevant citation is in our brief at page 36 at the top. And the airport's desk reference produced by FAA is the order 5050.4B, which was the one in effect at the time. Page 36? Yes, Your Honor. It states that for state-funded projects or state-involved projects, quote, FAA accepts the CNEL when a state requires that metric to assess noise effects. Where on the page are you, I'm sorry? The top two lines. All right, so that's in 5050. I've read it. It's in the-Ms. Listman, do you know where it is? Well, I was going to say it's in-sorry, Your Honor. It's in 5050.4B. Where in the papers we've got it? It's in J.A. Okay. I mean, it seems to me as if it was just a parenthetical saying basically that except in California where you use CNEL, I couldn't find anything to contextualize that as you claim in the brief, that that's really only when we're dealing with, what, new facilities, I think, construction projects and so on. Well, I didn't mean to limit it to new facilities. The explanation is that FAA will accept CNEL measurements when there's a project that the state requires it. And the state of California does require it for its own projects. If the state is building a runway, they'll use CNEL. And they can use CNEL under federal-they can give it to the federal agency, and the federal agency can make use of it. So it's a permissive aspect of the FAA's own internal order governing these things. But the parentheses about except in California, I mean, for one thing, it's sort of tautological. I mean, this is a state-CNEL is a creature of the state of California. It's the California noise EL. I regret I don't know the last name. But in any event, there isn't anything requiring the use of CNEL for federal projects in California, which this was. This was an exclusively federal project because it took place exclusively in the sky, 49 U.S.C. 4103 says that the FAA and the United States has sovereignty over all the national airspace. There was no state involvement. So you're saying it's not really in California. It's because it's in the sky? Well, it's not. I mean, that's what it might be. I don't know the answer to that question, and I am not authorized to answer it. But I will say this. Nothing about this project required the participation of the government of California or compliance with its own state laws and regulations. All right. Anything else? No. Okay. Thank you. Thank you, Your Honor. Did Ms. Slickman or Mr. Tabor have any time left? Excuse me. May I continue with Mr. McFadden for just a moment? You want to come back up? Yeah. My able clerk has identified the location here. Here's what it says. For example, in the context of noise in airplanes and helicopters, noise-sensitive areas include such areas within the DNL-65 noise contour, in California you use the CNEL instead of the DNL metric. It sounds like this is about noise contours. It does sound like that, Your Honor, and I'd have to look at the rest of the page. Excuse me. It's in the blue addendum at 93 and 262. Okay. Thank you. Yeah, here it is at 93. Let me just tell you what I do know about it. I don't want to speculate about that. I mean, it was never proposed that the noise contours used for this project should have been revised from what are provided in Part 150 based on DNL, and I don't know that they could be revised by an FAA desk order when those noise contours are established by duly promulgated regulation. The 65 DNL contour is in Part 150. It is the legally relevant contour for the agency's NEPA purposes, and also for many other purposes for federal funding for noise mitigation projects and et cetera. And so to the extent that the agency might consider CNEL in California, we know that it can't modify that regulatory requirement, but it certainly could take those into consideration. It could measure the noise in different ways to determine where noise-sensitive areas might lie. But what's missing from this case, even accepting Your Honor's interpretation of the FAA airport desk reference, is any indication that there were missed noise-sensitive areas or misdrawn contours. I mean, none of the noise increases at issue in this project are so close to the 65 DNL threshold that a change in the measurement might not necessarily have kicked it over. I mean, we don't have ñ none of that triggering information is suggested. We just have the suggestion in the opening brief that CNEL would have been more informative to the people of California and they wish that we had used that. So you're saying there's no claim that it would have made a difference? That's right. All right. Thank you. Okay, thank you. Thank you, Your Honor. So, Ms. Lichtman and Mr. Tate, you can each take a minute if you like. Two items, if I may. One, with respect to CNEL, very important in one way, cumulative impacts. In California, every noise is analyzed under CNEL. If you are trying to do a cumulative impact analysis in California, you have to in some way compare apples and oranges. CNEL is not the same as DNL. Therefore, we're not getting an accurate cumulative impact. If there were any cumulative impact analysis in this document for noise, you would have to use CNEL in order to properly analyze cumulative impact. That being said, one last thing. Did the screening actually equal a noise analysis? Did the what? Did the screening under NERS, starting in 2011, was it actually the same as a noise analysis? The answer is in the record. The FAA has taken the position that the screening tool is a, quote, dramatic simplification of what a full and detailed noise analysis would require. That's a JA-66. Yes, but I thought if I understood, counsel for the government, it's crude, but it's meant to be over-inclusive so that it doesn't miss things and it didn't turn anything up. Missing things and analyzing things in the correct way are two entirely different matters. The question is whether, yes, I understand. Is the screening I thought was used to see where analysis is needed? Correct. Okay. And so it's meant to be over-inclusive? That I can't say, Your Honor. I can only say it's not analysis. Well, it's crude. The only exception in the rule is for analysis beginning before 2012. This did not. I think your response when we were discussing this earlier, and Mr. McFadden alluded to it, was that ratification isn't enough. Ratification is not enough. That is correct. Okay. So, Ms. Zuckerman, do you want to say something about this section of your brief that I asked your colleague about? I'm sorry? Deference to? Ah, yes. I want to know what support you have for the proposition that, quote, deference to FAA technical determinations contravenes the most basic constitutional policies of the separation of powers. Where does that come from? That comes from Justice Gorsuch. That's his actual quote. Yeah. And he didn't say where that came from.  Yes, he was, Your Honor. But that's not – that's – that's – so is it your position that we owe no deference to the FAA in terms of interpretation of the statute? You owe deference to the FAA in terms of interpretation of a statute. We do. You agree with that? That's correct. Okay. But not with respect to FAA actions that are inconsistent with the statute and with its own interpretation of the ambiguous statutory provisions. What about the case law in our circuit which says that we owe a great deal of deference to the FAA in terms of interpreting its own regulations? That's right, but it goes – And under the APA, we have many cases which say we owe particularly deference to expert agencies when they're making technical judgments. Do you think both – do you think those are no longer operative? Now, Justice Gorsuch speaks from a theoretical perspective, as I was in that section. That's a dissent. That's a dissent, by the way, right? That's correct. Yeah. It's Judge Gorsuch then, correct? At the time I was in the Tenth Circuit, that's correct. And it's a dissent in the Tenth Circuit. That's right. At the time. And what is the relevance of that to us here today? Because the Gutierrez case also covers FAA actions that are inconsistent with agencies' interpretation of ambiguous statutory provisions. In this case, the FAA interpreted and established a regulation requiring the use of the AEDT model. It used NERS instead. That was an action inconsistent with its own interpretation of the law and its requirements. Therefore, Judge Gorsuch's dissent covers the FAA's action in this case. Okay. We'll hear from Mr. Tabor. Mr. Tabor, you have one minute. Two points, Your Honors. With respect to the white paper and the movement of Cliffie, the conclusions that were reached in both of those instances was that there was no significant increase in noise. And so, therefore, the action was okay by the FAA standards. The other point that I'd like to raise is that the goals that we're talking about that we find in Vision 100, the seven goals refer to the next-gen air transportation system. And it refers to the system in general rather than specifically the development of flight paths. Number seven, the one that we were talking about, about reduction of noise, specifically mentions that when you are looking at flight departure and approach routes, that you have to look at or consider to the greatest degree of practical the reduction of noise and emissions. So the point you just made, though, about Cliffie and the other changes that were made, I think in response to public comment, correct? Those were efforts by the FAA to reduce the increase, right? Or alternatively to reduce the increase below what it otherwise would have been. It's just not below the status quo. Correct. Okay. That's my understanding. Okay, thank you. Thank you. All the cases submitted.
judges: Tatel, Edwards, Ginsburg